IN THE MATTER OF: AMY BETH PEIRCE, MINOR (DOB: 12/17/78)

No. 8025DC919

(Filed 18 August 1981)

**1. Parent and Child § 1; Rules of Civil Procedure § 1— procedure to terminate parental rights—rules of civil procedure inapplicable**

G.S. Ch. 7A, Art. 24B exclusively controls the procedure to be followed in the termination of parental rights, and the Rules of Civil Procedure are inapplicable to such a proceeding.

**2. Parent and Child § 1— procedure to terminate parental rights**

The statutorily established procedure for the termination of parental rights does not include the right to file a counterclaim. G.S. 7A-289.29.

**3. Parent and Child § 1; Trial § 6— proceeding to terminate parental rights—recording of hearing—stipulation**

In a proceeding to terminate parental rights, respondents were estopped from complaining on appeal as to the quality of recording equipment used to record the proceeding, since all parties stipulated to the use of recording machines in lieu of a court reporter for the taking of evidence; furthermore, respondents failed to show that they were prejudiced by the loss of specific portions of testimony resulting from a gap in the tape recording of the proceeding where respondents did not allege or show in the record what the lost testimony was.

**4. Parent and Child § 1— proceeding to terminate parental rights—preliminary hearing**

There was no merit to respondents' argument that the trial court failed to conduct a satisfactory preliminary hearing as required by G.S. 7A-289.29(b), since the trial judge, in the judgment terminating respondents' parental rights, specifically stated that a preliminary hearing with due notice was conducted by him and the judge specifically set out the issues which were arrived at in the special hearing to be determined at the subsequent trial.

**5. Parent and Child § 1; Evidence § 48.1— proceeding to terminate parental rights—parenting skills—expert testimony**

In a proceeding to terminate parental rights the trial court did not err in permitting a social worker to state her opinion concerning respondents' parenting skills, since the experience the witness received as a social worker for approximately four years gave her qualifications and skills superior to those of the jury to determine whether respondents' actions in leaving their child in the hospital in North Carolina when they moved to Florida were indicative of good parenting skills; moreover, it was proper for the court on appeal to consider the validity of the trial court's admission of the witness's testimony, despite the fact that she was not formally tendered as an expert.

6. **Parent and Child § 1; Evidence § 33— proceeding to terminate parental rights —hearsay testimony**

In a proceeding to terminate parental rights where the evidence tended to show that respondent mother moved to Florida, leaving the child in question in a hospital in N.C., the trial court properly sustained petitioner's objection to the question, "Did the Florida Department of Health and Rehabilitative Services contact you in any way regarding the three children in your home to rehabilitate you or to remove your children for being abused, neglected or dependent?" since such question called for hearsay testimony.

7. **Parent and Child § 1; Evidence § 33— proceeding to terminate parental rights —admissibility of letters**

In a proceeding to terminate parental rights the trial court erred in excluding letters from respondents' counsel to respondents informing them of the progress in petitioner's effort to transfer respondents' child from N.C. to a foster home in Florida where respondents were residing, since the letters were admissible to establish the state of mind of respondents, but exclusion of the letters was harmless error.

8. **Parent and Child § 1; Evidence § 25— proceeding to terminate parental rights —photographs**

In a proceeding to terminate parental rights the trial court erred in admitting photographs of the child in question, since there was no testimony for the photographs to illustrate; however, respondents failed to show that they were prejudiced or that the trial court's judgment was influenced by the erroneous admission of the photographs.

9. **Parent and Child § 1; Rules of Civil Procedure § 60— proceeding to terminate parental rights—amendment of judgment**

The trial court acted within its authority in amending its judgment to state that the best interest of the child in question would be served by the termination of parental rights, since the omission of that phrase was an inadvertent clerical oversight, and the trial judge's amendment of the judgment to conform it to his original intention was correct under the authority of G.S. 1A-1, Rule 60(a).

APPEAL by respondents from *Crotty, Judge.* Judgment entered 4 June 1980 in District Court, BURKE County. Heard in the Court of Appeals 6 April 1981.

On 15 March 1979, Judge Samuel McDowell Tate entered an immediate custody order granting temporary custody of Amy Beth Peirce (hereinafter Amy) to the Burke County Department of Social Services (hereinafter petitioner). That order was granted pursuant to a juvenile petition filed on 15 March 1979 by the petitioner alleging that Amy was a neglected child as defined by G.S. 7A-278(4) and asking the court award it custody of Amy. Peti-

tioner further alleged that Amy had been admitted to Grace Hospital on 12 March 1979 with an admitting diagnosis of possible pneumonia and that the failure of Amy's parents, Gayle F. and Kenneth W. Peirce, to cooperate had hampered petitioner's efforts to remedy conditions. On the same day that Judge Tate entered his immediate custody order, Judge Livingston Vernon entered an order appointing C. Thomas Edwards Guardian Ad Litem to represent Amy.

Subsequently, and on 19 March 1979, Judge Vernon entered an order in which he found that Amy was a neglected child as defined in G.S. 7A-278(4), because she was living in an environment injurious to her welfare. Judge Vernon ordered that petitioner retain temporary custody of Amy until further orders of the court were issued.

Then followed a series of orders in which the district court continued temporary custody of Amy with petitioner.

On 28 November 1979, petitioner filed a petition to terminate the parental rights of Gayle F. Peirce and Kenneth W. Peirce (hereinafter respondents) in Amy. Specifically, petitioner requested that respondents' right to consent or object to the adoption of Amy be terminated. Petitioner's suit to terminate respondents' parental rights arose from the earlier action in which Amy was declared a neglected child. As grounds for the requested order, petitioner alleged that Amy had been in foster home care from 5 April 1979 until the date of the filing of the petition and that neither respondent had paid any support for the care of Amy since the initial order placing her in petitioner's custody.

Respondents filed their answer to the petition to terminate parental rights on 22 February 1980. In this pleading they admitted and denied various allegations of the petition. As a further answer and defense and counterclaim respondents alleged: first, that petitioner had failed to institute proceedings to transfer Amy to Florida where they were residents, and requested the court to order petitioner to institute such proceedings so that Amy could be placed in a foster care home near them; second, that petitioner had failed to attempt to rehabilitate, counsel, or reconcile Amy with respondents and had not attempted to work with respondents with regard to their parental abilities as re-

quired by G.S. 7A-542, and no evaluation or home placement or treatment plan had been presented by petitioner as required by G.S. 7A-545; third, that Amy's best interests would be served by transferring her to the proper authorities in the State of Florida so that she could be placed in a foster home there and eventually be reconciled with respondents; and, fourth, in the alternative that they, respondents, be awarded custody of Amy.

On 20 March 1980, Amy's guardian ad litem made a motion to strike respondents' further answer and defense and counterclaim. This motion was made pursuant to G.S. 1A-1, Rule 12(b)(f) on the grounds that respondents' further answer and defense and counterclaim were irrelevant, immaterial and improvidently brought under G.S. 7A-289.22 *et seq.* Subsequently, at trial, the court, over respondents' objection, struck portions of respondents' further answer and defense and counterclaim.

The trial court conducted a hearing on the petition to terminate parental rights. Gail Whisnant who was an employee of petitioner with the status of "Social Worker II" was petitioner's only witness. Her testimony tended to show the following: The termination of parental rights suit grew out of the suit declaring Amy to be a neglected child. Amy was placed in petitioner's custody when she was three months old, and at the time of this hearing she was one year and three months old. At the time the petition was filed, Miss Whisnant felt that the best interests of the child would be served by the termination of respondents' parental rights.

Amy was in the hospital when the initial order of 15 March 1979, in which Judge Tate found Amy to be a neglected child and awarded temporary custody to petitioner, was filed. On approximately 16 or 17 March 1979, while the child was still hospitalized, respondents moved from North Carolina to Florida. Respondents still resided in Florida at the time of the hearing, and Amy was in a foster home in North Carolina.

On 9 April 1979, Judge Vernon entered an order directing respondent, Kenneth W. Peirce, to pay the court $20 per week for Amy's support. Neither petitioner nor Amy ever received payment of any support from either of her parents-respondents.

Following the temporary placement of Amy's custody with petitioner on 15 March 1979, respondents' attorney, on behalf of

In re Peirce

respondents, made one request that they be allowed to visit their child. Sometime in July 1979, respondents visited their daughter in petitioner's office. Respondents were 45 minutes late for their initial appointment to visit their child, and she had been returned to the foster parents when they arrived. However, they did later visit their child for approximately one hour. Miss Whisnant stated that to her knowledge respondents had done nothing to reconcile themselves with the child. It was not her responsibility to enact programs to improve the parenting skills of respondents, because they did not live in North Carolina. Miss Whisnant instituted proceedings in June 1979 through the North Carolina Interstate Compact to send Amy to Florida. She requested placement of the child by the Florida authorities with the respondents. Placement of the child with respondents was disapproved by both North Carolina and Florida. Miss Whisnant testified that Florida would not accept placement of the child in Florida.

Miss Whisnant did not request placement of Amy in a foster home in Florida. She stated that she thought that it was legally possible to place a child in Florida for foster care. However, she could not institute proceedings to transfer Amy to a foster home in Florida, because Burke County did not have the funds to pay for such an arrangement.

Petitioner inquired of the proper Florida authorities by letter, respondents' exhibit #1, as to whether Florida would consider taking custody of Amy so that she could be placed in a foster home closer to her parents. Florida did not respond to this request that they take custody of the child.

Respondents' evidence consisted of the testimony of respondent, Gayle F. (Peirce) Ulery, Amy's mother. Mrs. Ulery's testimony tended to show that she left North Carolina in 1979, despite the fact that Amy was hospitalized here, because she had planned to go to Florida before Amy was hospitalized, and before petitioner took temporary custody of the child. She also moved because there were more and better paying jobs and more housing in Florida. Respondent testified that she did not give petitioner her Florida address when she moved, because petitioner did not ask for it. She did not see any reason to contact petitioner in the intervening year.

Respondent, Ulery, testified that in March of 1979 she and her former husband, respondent, Kenneth Peirce, and their three children moved into a three bedroom house in Florida. Both respondents worked for Master Plastics. In August, Gayle and Kenneth Peirce separated, and Kenneth left the home. Gayle Peirce did not divorce Kenneth Peirce, because she discovered at the time of their separation that he was a bigamist and was still married to another woman. After Kenneth left the home in August, Gayle Peirce got a job with Master Tools to support her family. She met Rick Ulery in August at Master Tools. In November they were married. Respondent, Gayle (Peirce) Ulery, stopped work in January of the following year. The family now resides in a one bedroom apartment in Opa Locka, Florida. The three children share the bedroom, and respondent and Mr. Ulery sleep on the sofa bed in the living room.

As to her visit with Amy in July of 1979, respondent testified that she did not see Amy on the first occasion, since she had been delayed getting there, because she took a taxi from her motel to petitioner's office. Respondent stated that she had not visited Amy after July due to the fact that she believed petitioner was going to send Amy down to Florida.

With regard to support for Amy, Gayle (Pierce) Ulery stated that she had not sent any support money to petitioner in the six-month period preceding the hearing. She testified that she was not aware of any court order ordering her to support Amy. She stated that it was her former husband's obligation to support the child. Then respondent testified that she realized that it was her duty and responsibility to support Amy, but that she had not done so. She did not support Amy, because petitioner had custody of her. Respondent testified that she did not have the ability to support the child until after she married Mr. Ulery.

On 4 June 1980, after considering all of the evidence, Judge Crotty entered judgment finding facts and making conclusions of law and decreeing that the parental rights of respondents in Amy be terminated. Respondents' right to object or consent to the adoption of Amy was specifically terminated. Respondents immediately gave notice of their intent to appeal this judgment.

*Byrd and Edwards, Guardian Ad Litem, by C. Thomas Edwards, and Powell and Settlemyer, by Douglas F. Powell and Sueanna P. Peeler, for petitioner appellee.*

*Catawba Valley Legal Services, Inc., by Ellis L. Aycock and Warren C. Hodges, for respondent appellants.*

MORRIS, Chief Judge.

Respondents made 27 assignments of error in the record on appeal. They cite all but one of these assignments of error in support of 13 arguments which they bring forth in their appellate brief.

Defendant initially argues that the trial court erred by striking paragraphs three and four of respondent's Further Answer and Defense and Counterclaim to the petition to terminate parental rights. Defendant maintains that G.S., Chap. 7A, Art. 24B, "Termination of Parental Rights" allows the respondent in a termination of parental rights case to file counterclaims as part of its answer. Although, G.S. 7A-289.29(a) does not specifically allow a respondent in such a case to file anything other than an answer to the petition to terminate parental rights, respondents reason by analogy to the N.C. Rules of Civil Procedure, specifically G.S. 1A-1, Rule 7(a) and Rule 13, that the additional filing of counterclaims attached to the answer is permissible. We disagree.

[1] The intent of the legislature controls the interpretation of a statute. *State v. Fulcher,* 294 N.C. 503, 243 S.E. 2d 338 (1978); *State v. Hart,* 287 N.C. 76, 213 S.E. 2d 291 (1975). Moreover, "[w]hen the language of a statute is clear and unambiguous, there is no room for judicial construction and the courts must give the statute its plain and definite meaning. . . ." *In re Banks,* 295 N.C. 236, 239, 244 S.E. 2d 386, 388 (1978); *Peele v. Finch,* 284 N.C. 375, 200 S.E. 2d 635 (1973).

G.S. 7A-289.22 defines the legislative intent and construction to be given Art. 24B. G.S. 7A-289.22(1) provides in part:

> The general purpose of this Article is to provide *judicial procedures* for terminating the legal relationship between a child and his or her biological or legal parents . . . (Emphasis added.)

The sections of Art. 24B comprehensively delineate in detail the judicial procedure to be followed in the termination of parental rights. This article provides for the basic procedural elements which are to be utilized in these cases. For example, G.S. 7A-289.24 sets out who may petition; G.S. 7A-289.25 establishes the requirements of the petition; G.S. 7A-289.26 describes the procedure to be followed for a preliminary hearing where the identity of one of the parents is unknown; and G.S. 7A-289.29 establishes the necessary contents of the answer. Due to the legislature's prefatory statement in G.S. 7A-289.22 with regard to its intent to establish judicial procedures for the termination of parental rights, and due to the specificity of the procedural rules set out in the article, we think the legislative intent was that G.S., Chap. 7A, Art. 24B, exclusively control the procedure to be followed in the termination of parental rights. It was not the intent that the requirements of the basic rules of civil procedure of G.S. 1A-1 be superimposed upon the requirements of G.S., Chap. 7A, Art. 24B. Therefore, in this case we need only ascertain whether the trial court correctly followed the procedural rules delineated in the latter.

[2] G.S. 7A-289.29 provides, with regard to the respondent's answer in cases where the court is petitioned to terminate parental rights, that:

> (a) Any respondent may file a written answer to the petition. The answer shall admit or deny the allegations of the petition and shall set forth the name and address of the answering respondent or his or her attorney.

This statute does not specifically grant the respondent in these cases the right to file a counterclaim, nor does any other section of G.S., Chap. 7A, Art. 24B, grant to respondent such a right. The statutorily established procedure for the termination of parental rights does not include the right to file a counterclaim, and we will not add that right by imputation. Therefore, it was not error for the trial court in the case *sub judice* to strike paragraphs three and four from respondents' Further Answer and Defense and Counterclaim.

Respondents allege in the alternative that paragraphs three and four were not counterclaims, but "actually did no more than suggest alternative resolutions of the action for consideration by

the court." Therefore, they should not have been stricken by the trial court.

A counterclaim is defined by Black's Law Dictionary, 4th Ed. as "[a] claim presented by a defendant in opposition to or deduction from the claim of the plaintiff." A counterclaim is a separate cause of action, seeking affirmative relief, while a defense merely defeats the plaintiff's cause of action by a denial or confession and avoidance. Both paragraphs of respondents' answer which are in question ask for affirmative relief in a manner which would benefit respondents.

In paragraph three of respondents' Further Answer and Defense and Counterclaim, respondents ask the trial court to place Amy in a foster home close to their own in Florida so that a reconciliation between them and the child might be effected.

Paragraph four asks the trial court to order that custody of Amy be transferred from petitioner to respondents. Both paragraphs ask for affirmative relief for respondents. They are not denials of the petition for termination of parental rights. Thus, the trial court properly considered them as being counterclaims and struck them from respondents' answer.

[3] In their second argument respondents submit that the trial court erred in failing to require adequate equipment and personnel to transcribe the hearing so that it could be preserved in the record on appeal. Respondents allege that the equipment utilized failed to record adequately the entire hearing, and portions actually taped were inaudible. They excepted to three portions of the record where they allege that portions of the testimony of Gayle Ulery and the arguments of counsel and discussion of the court were not recorded.

By motion filed 21 March 1980, respondents asked the trial court to furnish a court reporter or electronic or other mechanical device sufficient to record the trial. G.S. 7A-289.30(a) provides that the adjudicatory hearing on termination is to be reported as provided by G.S. 7A-198 for the reporting of civil trials. The latter statute specifies:

(a) Court-reporting personnel shall be utilized, if available, for the reporting of civil trials in the district court. If court reporters are not available in any county, electronic or other

mechanical devices shall be provided by the Administrative Office of the Courts upon request of the chief district judge.

The record of respondents' hearing does not indicate what type of equipment was used to record it. However, the record does state that, "Petitioner, Respondents, and the Guardian Ad Litem stipulated to the use of recording machines in lieu of a court reporter for the taking of evidence." Thus, respondents are estopped from complaining on appeal as to the quality of the recording equipment used. G.S. 7A-198 specifically authorizes the use of electronic recording equipment when court reporters are not available. There is nothing in the record to indicate that court reporters were available, and by their stipulation respondents waive any objection they might have had if they were. We find no error in the manner in which the district court had this hearing recorded.

Ancillary to this argument respondents have made general allegations that they were prejudiced by the loss of specific portions of testimony resulting from gaps in the tape recording. Respondents have failed to show that they were prejudiced in any manner by the loss of this testimony. Respondents have not alleged or shown in the record what the contents of the lost testimony was. Therefore, it is impossible for this Court to determine if they were prejudiced thereby.

[4] Respondents argue that the trial court failed to conduct a satisfactory preliminary hearing in this matter. G.S. 7A-289.29(b) provides:

If an answer denies any material allegation of the petition, . . . The court shall conduct a special hearing after notice of not less than 10 days nor more than 30 days to the petitioner, the answering respondent(s), and the guardian ad litem for the child, to determine the issues raises by the petition and answer(s). . . .

This statute does not prescribe the exact form the special hearing is to take except that it is to be used to determine the issues raised by the pleadings. Respondents argue in their brief that the trial court held a "brief conference" prior to trial in which a variety of issues were raised and discussed, but none was actually framed or reported for trial. Respondents assert that no written

notice was given by the court or any party ten days in advance of the hearing. Respondents contend that this procedure did not comply with the requirements of G.S. 7A-289.29(b).

The only evidence appearing in the record pertaining to any special preliminary hearing in this matter consists of Judge Crotty's statement in the judgment terminating respondents' parental rights. There he stated:

> It further appearing to the Court that a preliminary hearing was had in accordance with G.S. 7A-586 after due notice to the parties and that the issues for determination at the hearing to terminate parental rights were whether Amy Beth Peirce was a neglected child within the meaning of N.C. G.S. 7A-278(4), and whether the answering parents had failed to provide a reasonable sum for support for their minor child, Amy Beth Peirce, for six months after her placement in the custody of the Burke County Department of Social Services
> . . .

The trial court's citation of G.S. 7A-586 as the statute requiring preliminary hearing in the matters was obviously erroneous. G.S. 7A-586 deals with the appointments of the guardian ad litem and its duties. This is certainly not harmful error. The only evidence properly before this Court indicates that a preliminary hearing with due notice was conducted in this matter by the trial court. In his judgment Judge Crotty specifically set out the issues which were arrived at in the special hearing to be determined at the subsequent trial. This comports with the rather general statutory requirements of G.S. 7A-289.29(b) for such a special hearing. There is no evidence in the record to indicate that inadequate notice of the special hearing was given. The fact that the hearing was brief and held just prior to the trial does not conflict with the statutory requirements. Therefore, we hold that there was no error in the trial court's conduct of the special hearing.

[5] Respondents made four assignments of error to evidentiary rulings of the trial court. In their second assignment of error respondents claim the trial court erred in failing to sustain their objection to a question asked of witness Gail Whisnant calling for her expert opinion. On redirect examination the guardian ad litem asked Whisnant the following: "In your expert opinion is it indicative of good parenting skills to abandon a child in North

Carolina in March and move to Florida when that child is hospitalized?" Respondents' objection to the question was over-ruled and the court did not respond to respondents' motion to strike the witness's answer. Respondents contend that Whisnant was not an expert in this area sufficiently qualified to give her opinion, and that she was never properly tendered to the trial court as an expert. Therefore, the admission of her opinion testimony was error. We disagree.

The question of whether a witness is sufficiently qualified to be an expert is one of fact ordinarily to be determined at the discretion of the trial judge. *State v. King*, 287 N.C. 645, 215 S.E. 2d 540 (1975), *death sentence vacated*, 428 U.S. 903, 96 S.Ct. 3208, 49 L.Ed. 2d 1209 (1976); *Utilities Comm. v. Telephone Co.*, 281 N.C. 318, 189 S.E. 2d 705 (1972).

> To be an expert the witness need not be a specialist or have a license from an examining board or have had experience with the exact type of subject matter under investigation, nor need he be engaged in any particular profession or other calling. It is enough that, through study or experience, or both, he has acquired such skill that he is better qualified than the jury to form an opinion on the particular subject.

1 Stansbury, N.C. Evidence 2d, § 133 (Brandis rev. 1973), see cases cited therein. Judge Crotty impliedly found Miss Whisnant to be an expert in the area of parenting skills when he overruled respondents' objection to the guardian ad litem's question. The absence of a record finding in favor of the expert's qualifications is no ground for challenging the ruling implicitly made by the judge in allowing the witness to testify. *State v. Shaw*, 293 N.C. 616, 239 S.E. 2d 439 (1977); *Lawrence v. Insurance Co.*, 32 N.C. App. 414, 232 S.E. 2d 462 (1977). There was ample evidence to support Judge Crotty's implied finding that Miss Whisnant was better qualified than the jury to answer questions concerning parenting skills. Miss Whisnant testified that for almost four years she had been employed by petitioner, and that at the time of the trial she had the job status of "Social Worker II". We think that the experience Gail Whisnant received as a social worker for approximately four years gave her qualifications and skills superior to those of the jury to determine whether respondents' actions were indicative of good parenting skills.

Respondents complain that Miss Whisnant was not properly tendered to the court as an expert in the field of parenting skills. The better practice is for the party offering an expert witness formally to tender him or her as an expert witness and to request the court so to find. However, our Supreme Court has held that where the witness's qualifications as an expert are shown, the intent to offer the witness as an expert is clear, and the ruling of the court on the admission of the witness's testimony is expressly stated, the appellate court will consider the validity of the trial court's ruling on the admissibility of expert testimony. *Dickens v. Everhart*, 284 N.C. 95, 199 S.E. 2d 440 (1973). Without reiterating the relevant facts and circumstances surrounding Miss Whisnant's testimony, we think it was proper in this case for us to consider the validity of the trial court's admission of her testimony despite the fact that she was not formally tendered as an expert. This assignment of error is overruled.

[6] Respondent Gayle (Peirce) Ulery was asked on direct examination: "Did the Florida Department of Health and Rehabilitative Services contact you in any way regarding the three children in your home to rehabilitate you or to remove your children for being abused, neglected or dependent?" Petitioner's objection to this question was sustained. Respondents allege as their third assignment of error that the trial court's action in sustaining petitioner's objection to this question was in error. Respondents argue that the witness was competent to answer the question, that the question was not leading, and that the question did not call for a hearsay response by the witness.

No grounds were given by petitioner for its objection to this question. When such a general objection is sustained by the trial court, it may have deemed the evidence to have been inadmissible for any reason. *See* 1 Stansbury, N.C. Evidence, § 27 (Brandis rev. 1973). We think that the trial court properly sustained petitioner's objection to this question and respondents' answer, because it was hearsay. Evidence of nonassertive conduct can be hearsay. 1 Stansbury, N.C. Evidence, § 142 (Brandis rev. 1973). Conduct which was not intended by the actor to assert the existence of a fact nevertheless may tend to show that the actor believed that the fact existed. In this instance, respondent, Gayle (Peirce) Ulery, testified that the Florida Department of Health and Rehabilitative Services did not contact her in any way re-

garding the children remaining in her home, to rehabilitate her, or to remove those children from her home because they were abused, neglected or dependent. By so testifying, the witness implied that the Florida authorities, through the act of their silence or failure to contact her, believed that she was a fit mother for the children remaining in her home. For Mrs. Ulery to testify as to the implied belief of the Florida authorities was patently hearsay. The probative force of this evidence depends in whole upon the competency and credibility of the Florida Department of Health and Rehabilitative Services and not upon that of the witness, Mrs. Ulery. Respondents' assignment of error is overruled.

[7]   In their fourth assignment of error respondents assert that the trial court erred by sustaining petitioner's objection to the introduction into evidence of respondents' exhibits numbered 5 and 6. These exhibits consisted of two letters from respondents' counsel to respondents informing them of the progress, or lack thereof, in petitioner's effort to transfer Amy from North Carolina to a foster home in Florida. The purpose of the attempted introduction of these letters was to show that respondents thought their child was going to be sent to Florida during the time period when they allegedly failed to support their child.

Petitioner's objection to the introduction of the letters was based upon the grounds that they constituted hearsay, that they were self-serving statements, that they violated the best evidence rule, and for any other reason.

Respondents assert that this evidence was not hearsay because it was not offered to prove the truth of the contents of the letters, but rather they were offered to establish only the state of mind of the respondents during this time period. We think this reasoning is valid. Whenever the assertion of any person, other than that of the witness, is offered to prove the truth of the matter asserted, the evidence so offered is hearsay. *State v. Tilley*, 292 N.C. 132, 232 S.E. 2d 433 (1977). However, if a statement is offered for any purpose other than that of proving the truth of the matter stated, it is not objectionable as hearsay. *State v. Irick*, 291 N.C. 480, 231 S.E. 2d 833 (1977) *quoting*, 1 Stansbury, N.C. Evidence, § 141 (Brandis rev. 1973). The declaration of one person may be admitted to evidence a state of mind of

another person who heard or read them. *See, Cameron v. Cameron*, 232 N.C. 686, 61 S.E. 2d 913 (1950), 1 Stansbury, N.C. Evidence, § 141 (Brandis rev. 1973). That is precisely what occurred in the case *sub judice*. By introducing these letters, respondents' counsel attempted to show that respondents thought their child was going to be transferred from North Carolina to Florida. Respondents desired to show that they thought that Amy was going to be transferred to Florida as an explanation for why they failed to provide support or visit their child during the period prior to the filing of the termination petition.

For similar reason the best evidence rule was inapplicable in this instance to bar the introduction of these letters which were copies. The best evidence rule like the rule prohibiting the introduction of hearsay applies only when the contents or terms of a document are in question. *State v. Garner*, 34 N.C. App. 498, 238 S.E. 2d 653 (1977), *review denied*, 294 N.C. 184, 241 S.E. 2d 519 (1978) quoting 2 Stansbury, N.C. Evidence, § 191 (Brandis rev. 1973). Since the contents of these letters were not in question and the letters were only collaterally involved in the case, they should have been admitted into evidence even though they were not originals.

Nevertheless, we conclude that even though the letters should have been admitted into evidence, their exclusion was harmless error. Respondent Gayle (Peirce) Ulery testified, without objection, before and after the exclusion of these letters that it was her impression that there was a possibility that the child might be transferred to Florida. "The admission of incompetent testimony will not be held prejudicial when its import is abundantly established by other competent testimony, or the testimony is merely cumulative or corroborative." (Citations omitted.) *Board of Education, v. Lamm*, 276 N.C. 487, 493, 173 S.E. 2d 281, 285 (1970). Therefore, we hold that the exclusion of these letters from evidence in this instance was not such error as to require a new trial.

[8] Respondents' final argument as to alleged error concerning an evidentiary question pertains to the trial court's failure to sustain respondents' objection to the admission of petitioner's exhibits 1, 2, 3 and 4. These exhibits were photographs of Amy taken by petitioner's witness Gail Whisnant on 13 March 1979

while the baby was in the hospital. Respondents contend that the photographs should not have been admitted because they were presented as direct evidence of the child's condition at the time she was taken from respondents, rather than illustrating testimony of her condition.

The current rule in North Carolina is that photographs are not substantive evidence, and they may be used only to illustrate or explain the testimony of a witness. *Barnes v. Highway Commission*, 250 N.C. 378, 109 S.E. 2d 219 (1959); *van Dooren v. van Dooren*, 37 N.C. App. 333, 246 S.E. 2d 20, *review denied*, 295 N.C. 653, 248 S.E. 2d 258 (1978). The photographs in the case *sub judice* were admitted into evidence to show Amy's physical appearance on 13 March 1979. The record reveals that no witness gave testimony as to the condition or physical appearance of the child on that day. Gail Whisnant merely stated that the photographs "fit the physical appearance of Amy on that day." The photographs should not have been admitted over respondents' objection as there was no testimony for them to illustrate.

Even so, respondents have failed to show that they were prejudiced or that the trial court's verdict was influenced by the erroneous admission of the photographs. *See, Board of Education v. Lamm*, supra. In a trial by the court without a jury, the erroneous admission of evidence will not ordinarily be held prejudicial, because it is presumed that the court did not consider the incompetent evidence. *Cogdill v. Highway Comm.* and *Westfeldt v. Highway Comm.*, 279 N.C. 313, 182 S.E. 2d 373 (1971); *Anderson v. Insurance Co.*, 266 N.C. 309, 145 S.E. 2d 845 (1966). Hence any error which occurred through the admission of these photographs was harmless.

[9] The judgment terminating parental rights was entered 4 June 1980. On 15 September 1980, an order was filed amending the judgment to state that the best interests of the child would be served by the termination of parental rights. Respondents allege that the trial court was without authority under G.S. 1A-1, Rule 52(b), to so amend its judgment, because no motion to amend was made by a party as required by the rule.

However, G.S. 1A-1, Rule 60 provides:

(a) *Clerical mistakes*. Clerical mistakes in judgments, orders or other parts of the record and errors therein arising from

oversight or omission may be corrected by the judge at any time on his own initiative or on the motion of any party and after such notice, if any, as the judge orders. During the pendency of an appeal, such mistakes may be so corrected before the appeal is docketed in the appellate division, and thereafter while the appeal is pending may be so corrected with leave of the appellate division.

In his order amending the intitial judgment Judge Crotty stated:

That in reciting the Judgment of the Court of ~~14 March~~ June 1980 the Court directed that the best interests of the minor child would be served by the termination of parental rights after having recited its findings of fact and conclusions of law;

That when the Judgment was prepared and tendered to the undersigned, said language had been inadvertently omitted from said Judgment.

The judgment of the trial court is presumed to be regular and valid. *London v. London*, 271 N.C. 568, 157 S.E. 2d 90 (1967). Judge Crotty's statement suffices to show that the omission of the phrase, "the best interest of the minor child would be served by the termination of parental rights," from the original judgment was an inadvertent clerical oversight. Thus, we think that Judge Crotty's amendment of the judgment to conform it to his original intentions was correct under the authority of G.S. 1A-1, Rule 60(a). The order amending the judgment was entered on 15 September 1980. Subsequently, the appeal was filed and docketed with this Court on 29 September 1980. This comports with the time limitations of the statute.

As a second part of this argument, respondents contend that the trial court failed to consider the best interests of the child in its judgment. Having held that the judgment was properly amended to state that it was the opinion of the trial court that the best interests of the child would be best served by the termination of respondents' parental rights, respondents' argument is rendered specious. Clearly, it is within the discretion of the trial judge to determine whether parental rights should be terminated according to what he believes to be in the child's best interests. Respondents have shown no adequate reason for us to override the decision of the trial judge in this instance.

We have carefully studied respondents' remaining assignments of error, and have determined that they do not involve error sufficiently prejudicial to overturn the judgment of the district court. Accordingly, that judgment is

Affirmed.

Judges MARTIN (Harry C.) and HILL concur.